# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 23-518


**STATE OF LOUISIANA**

**VERSUS**

**DILLON MATHEW JAMES**


**\*\*\*\*\*\*\*\*\*\***

APPEAL FROM THE
THIRTIETH JUDICIAL DISTRICT COURT
PARISH OF VERNON, NO. 97,242
HONORABLE TONY A. BENNETT, DISTRICT JUDGE

**\*\*\*\*\*\*\*\*\*\***

## CHARLES G. FITZGERALD
## JUDGE

**\*\*\*\*\*\*\*\*\*\***

Court composed of Van H. Kyzar, Charles G. Fitzgerald, and Gary J. Ortego, Judges.


**AFFIRMED AND REMANDED
WITH INSTRUCTIONS.**

**Chad M. Ikerd**
**Ikerd Law Firm, L.L.C.**
**600 Jefferson Street, Suite 903**
**Lafayette, Louisiana 70501**
**(337) 366-8994**
**Counsel for Defendant/Appellant:**
    **Dillon Mathew James**


**Terry W. Lambright**
**District Attorney**
**Thirtieth Judicial District**
**William M. Thornton**
**Assistant District Attorney**
**Post Office Box 1188**
**Leesville, Louisiana 71466**
**(337) 239-2008**
**Counsel for Appellee:**
    **State of Louisiana**

**FITZGERALD, Judge.**

Defendant, Dillon Mathew James, appeals his conviction and sentence for second degree battery.

**SUMMARY OF FACTS AND PROCEDURAL HISTORY**

Shortly before 3:00 a.m. on December 17, 2021, Defendant and his brother and a few others decided to go mud riding. As the brothers were driving down the road, they came upon their grandfather's residence and noticed a vehicle parked at the end of the driveway. Their grandfather, Wallace James, was in his eighties and had cancer. The brothers got out of their vehicles to investigate and saw a man walking down the driveway towards them.

The man, Woodie Blanks Jr., delivered newspapers for the Lake Charles American Press, and he was delivering Mr. Wallace's newspaper. Mr. Blanks was walking back to his vehicle after dropping the newspaper off on Mr. Wallace's porch, which he normally did because of Mr. Wallace's poor health. The brothers did not know Mr. Blanks, and they did not know why he was on their grandfather's property. An altercation ensued, resulting in significant injuries to the sixty-seven-year-old Mr. Blanks.

On January 31, 2022, Defendant was charged by bill of information with second degree battery in violation of La.R.S. 14:34.1. Defendant's trial began on October 17, 2022. Three days later, he was convicted as charged by a unanimous six-person jury verdict. Five months after that, on March 14, 2023, the trial court denied Defendant's motion for new trial and motion in arrest of judgment, and then imposed an eight-year hard labor sentence, suspended one year, and placed Defendant on supervised probation for three years. The trial court also imposed a fine of $2,000.00 and court costs, both of which were ordered to be paid during

probation. Additionally, the trial court ordered Defendant to pay a monthly supervision fee of $60.00 and $11.50 to the sex offender technology fund. Defendant appealed.

On appeal, Defendant asserts the following assignments of error: (1) the State failed to sufficiently prove that he was guilty of second degree battery; (2) his eight-year at hard labor sentence, with one year suspended, is excessive; and (3) the trial court erred in allowing Defendant's prior testimony to be read to the jury when the testimony was given in a case in which he was not a defendant, thereby violating his constitutional right against self-incrimination.

## LAW AND ANALYSIS

### I. Errors Patent

All appeals are reviewed for errors patent on the face of the record. La.Code Crim.P. art. 920. Based on our review of the record, there is an error patent involving the conditions of probation, a possible error patent involving the lack of a twenty-four-hour delay between the denial of post-trial motions and sentencing, and two errors in the minutes of sentencing.

First, we will address the error patent involving the conditions of probation. The trial court imposed a $2,000.00 fine and court costs as conditions of Defendant's probation but failed to establish a payment plan. The same error was addressed in *State v. James*, 23-238 (La.App. 3 Cir. 10/25/23), 373 So.3d 509.[1] There, a panel of this court explained:

> For the defendant's conviction of second-degree battery, the court sentenced him to serve eight years at hard labor with one year suspended. The defendant was placed on supervised probation for three years and ordered to pay a monthly supervision fee of $65.00 and

---

[1] In that case, Defendant's brother's conviction and sentence for second degree battery of Mr. Blanks were affirmed.

2

$11.50 per month to the sex offender technology fund. Additionally, the defendant was ordered to pay a $2,000.00 fine and court costs. A monthly payment plan *was* established for the supervision fee and the sex offender technology fund fee; however, a payment plan was not established for the $2,000.00 fine and court costs. Accordingly, the defendant was not put on notice of how the fine and court costs must be paid to comply with his probation and avoid possible revocation. Thus, the defendant's case must be remanded for the establishment of a payment plan in compliance with La.Code Crim.P. art. 875.1.

*Id*. at 1.

For these same reasons, we must remand this case to the trial court for the establishment of a payment plan for the fine and court costs imposed as conditions of Defendant's probation.

Now to the possible error patent. The trial court sentenced Defendant on the same day that it overruled Defendant's motion for new trial and motion in arrest of judgment. Yet La.Code Crim.P. art. 873 provides:

If a defendant is convicted of a felony, at least three days shall elapse between conviction and sentence. If a motion for a new trial, or in arrest of judgment, is filed, sentence shall not be imposed until at least twenty-four hours after the motion is overruled. If the defendant expressly waives a delay provided for in this article or pleads guilty, sentence may be imposed immediately.

So the issue is whether Defendant expressly waived the twenty-four-hour delay in Article 873. To this end, after the trial court denied Defendant's motions, the court noted defense counsel's objection. Importantly, defense counsel then replied as follows: "Thank Your [sic] Honor. And I believe that brings us to sentencing?" In response, the trial court stated: "All right. At this time, we will move forward to the sentencing." When the trial court asked the defense if it had anything to present, defense counsel replied, "Um, no, Your Honor." The trial court then proceeded to consider the facts of the case, the sentencing guidelines of La.Code

3

Crim.P. art. 894.1, and the presentence investigation report. Thereafter, the trial court imposed sentence.

The jurisprudence on this issue is summarized below. For instance, in *State v. Kisack*, 16-797 (La. 10/18/17), 236 So.3d 1201, *cert. denied*, 583 U.S. 1160, 138 S.Ct. 1175 (2018), the Louisiana Supreme Court found that the waiver must be express, not implicit. Distinguishing between the two types of waivers, the court explained that merely participating in the sentencing hearing would be considered an implicit waiver. And although announcing a readiness for sentencing had been considered an implicit waiver by some appellate courts, the supreme court explained that such a waiver should be considered an express waiver. Subsequently, in *State v. Boyd*, 17-1749 (La. 8/31/18), 251 So.3d 407, the supreme court found an express waiver was made when the defense responded that it had no objection to proceeding with sentencing.

More recently, in *State v. Samuel*, 19-408, pp. 10–13 (La.App. 3 Cir. 2/5/20), 291 So.3d 256, 263–65, *writ denied*, 20-398 (La. 7/24/20), 299 So.3d 77, a panel of this court found that defense counsel's response, "Yes, Your Honor[,]" when asked if Mr. Samuel was ready to be sentenced was an express waiver of the Article 873 delay. Similarly, in *State v. Kirby*, 22-757, p. 2 (La.App. 4 Cir. 4/26/23), 360 So.3d 641, 645 n.1, *writ denied*, 23-684 (La. 12/19/23), 374 So.3d 979, the fourth circuit noted that defense counsel "[e]ffectively waived" the Article 873 delay by stating, "'We're ready to proceed with sentencing.'"

Again, the trial court here overruled Defendant's post-trial motions. Immediately thereafter, defense counsel stated, "I believe that brings us to sentencing[.]" In our view, this statement constitutes an express waiver of the Article 873 delay.

Finally, the minutes of sentencing must be corrected. Specifically, the minutes do not state that the fine and court costs were imposed as conditions of probation. Yet the sentencing transcript makes clear that the fine and court costs were imposed as conditions of Defendant's probation. Additionally, the minutes reflect that the trial court ordered Defendant to pay $5.50 per month to the Sex Offender Registry Technology Fund, but the transcript states that the trial court ordered Defendant to pay $11.50 per month to the Sex Offender Registry Technology Fund. "[W]hen the minutes and the transcript conflict, the transcript prevails." *State v. Wommack*, 00-137, p. 4 (La.App. 3 Cir. 6/7/00), 770 So.2d 365, 369, *writ denied*, 00-2051 (La. 9/21/01), 797 So.2d 62. Accordingly, the trial court will be instructed on remand to correct the sentencing minutes to accurately reflect the imposition of the fine and court costs as conditions of Defendant's probation, and to accurately reflect that Defendant must pay $11.50 per month to the Sex Offender Registry Technology Fund.

## II.    Defendant's First Assignment of Error

In his first assignment of error, Defendant contests the sufficiency of the evidence to sustain his second degree battery conviction. His primary contention is that his actions were justified under the circumstances of the encounter. Though he does not dispute that the victim suffered serious bodily injury, he argues that the State failed to prove he was the one who inflicted the serious bodily injury.

A sufficiency-of-the-evidence challenge is reviewed on appeal under the standard set forth by *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781 (1979). "[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* at 319. "This standard, now

legislatively embodied in La.C.Cr.P. art. 821, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the fact-finder." *State v. Pigford*, 05-477, p. 6 (La. 2/22/06), 922 So.2d 517, 521. The appellate court's function is not to assess the credibility of witnesses or to reweigh the evidence. *State v. Smith*, 94-3116 (La. 10/16/95), 661 So.2d 442.

A reviewing court must afford great deference to a jury's decision to accept or reject the testimony. *State v. Allen*, 36,180 (La.App. 2 Cir. 9/18/02), 828 So.2d 622, *writs denied*, 02-2595 (La. 3/28/03), 840 So.2d 566, and 02-2997 (La. 6/27/03), 847 So.2d 1255, *cert. denied*, 540 U.S. 1185, 124 S.Ct. 1404 (2004). "Where there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency." *Id.* at 626.

And as pointed out by this court in *State v. F.B.A.*, 07-1526, p. 2 (La.App. 3 Cir. 5/28/08), 983 So.2d 1006, 1009 (second alteration in original), *writ denied*, 08-1464 (La. 3/27/09), 5 So.3d 138:

> [T]he testimony of a single witness is sufficient to support a conviction "[i]n the absence of internal contradiction or irreconcilable conflicts with physical evidence." *State v. Dixon*, 04-1019, p. 12 (La.App. 5 Cir. 3/15/05), 900 So.2d 929, 936. The trier of fact may accept or reject the testimony of any witness, and the determination of the credibility of that witness, in whole or in part, is left to its sound discretion and "will not be re-weighed on appeal." *Id.* at 936.

Louisiana Revised Statutes 14:34.1 defines second degree battery as "a battery when the offender intentionally inflicts serious bodily injury[.]" A battery is "the intentional use of force or violence upon the person of another[.]" La.R.S. 14:33. Serious bodily injury is defined as "bodily injury which involves unconsciousness; extreme physical pain; protracted and obvious disfigurement; protracted loss or

6

impairment of the function of a bodily member, organ, or mental faculty; or a substantial risk of death." La.R.S. 14:2(C).

In addition, second degree battery requires specific intent. *State v. Robertson*, 98-883 (La.App. 3 Cir. 12/9/98), 723 So.2d 500, *writ denied*, 99-658 (La. 6/25/99), 745 So.2d 1187. "Specific criminal intent is that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." La.R.S. 14:10(1). "Specific intent may be inferred from the circumstances surrounding the offense and the conduct of the defendant." *State v. Draughn*, 05-1825, pp. 7–8 (La. 1/17/07), 950 So.2d 583, 592–93 (citations omitted), *cert. denied*, 552 U.S. 1012, 128 S.Ct. 537 (2007). Specific intent may be formed in an instant. *State v. Cousan,* 94-2503 (La. 11/25/96), 684 So.2d 382. "[S]pecific intent to cause serious bodily injury 'may be inferred from the extent and severity of the victim's injuries.'" *State v. Williams*, 20-605, p. 33 (La.App. 3 Cir. 11/3/21), 329 So.3d 938, 955 (quoting *State v. Hager*, 13-546, p. 6 (La.App. 5 Cir. 12/27/13), 131 So.3d 1090, 1093), *writ denied*, 21-1798 (La. 4/12/22), 336 So.3d 85.

Finally, La.R.S. 14:24 defines a principal as follows: "All persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime, are principals." As explained in *State v. Petty*, 12-278, p. 11 (La.App. 5 Cir. 10/30/12), 103 So.3d 616, 623:

> Only those persons who knowingly participate in the planning or execution of a crime are principals to that crime. An individual may only be convicted as a principal for those crimes for which he personally has the requisite mental state, and the mental state of one defendant may not be imputed to another defendant. Thus, mere

7

presence at the scene of a crime does not make one a principal to the crime. However, it is sufficient encouragement that the accomplice is standing by at the scene of the crime ready to give some aid if needed, although in such a case it is necessary that the principal actually be aware of the accomplice's intention. *State v. Page*, 08–531 (La.App. 5 Cir. 11/10/09), 28 So.3d 442, 449, *writ denied*, 09–2684 (La.6/4/10), 38 So.3d 299.

Turning now to the evidence adduced at trial. The first witness to testify at trial was Robert Green, an officer with the Rosepine Police Department. Officer Green testified that on December 17, 2021, at approximately 3:00 a.m., he heard an individual "banging on the back" of his door at the police station. Officer Green identified the individual as Woodie Blanks Jr. According to Officer Green, Mr. Blanks said that he "had been jumped." Officer Green noticed that Mr. Blanks's eyes were swollen, and there was blood on his face and head. Mr. Blanks also appeared to be confused and in serious pain. Officer Green called for emergency assistance and then left to go to an apartment complex which is where he initially believed the incident occurred.

However, Officer Green was unable to locate the suspects, and he returned to the police department. But as he approached the police station, he noticed Mr. Blanks driving out of the parking lot. Officer Green recalled that Mr. Blanks was having difficulty driving, so he pulled Mr. Blanks over at a nearby gas station and requested that medical emergency assistance respond there. When Officer Green learned that the incident occurred outside of his jurisdiction, he contacted the Vernon Parish Sheriff's Office. According to Officer Green, Mr. Blanks stated that one of the suspects might be the grandson of Wallace James.

On cross-examination, Officer Green testified that Mr. Blanks was wearing blue jeans and a shirt, but he could not recall whether Mr. Blanks was wearing a mask. Mr. Blanks told Officer Green the incident occurred on Catfish Hut Road,

8

though he did not specify the address. Officer Green could not remember whether Mr. Blanks's vehicle signified that he worked for the American Press or that he delivered newspapers.

Deputy Jacob Durrett was assigned to the patrol division of the Vernon Parish Sheriff's Office. Deputy Durrett was dispatched to the gas station to take a statement from Mr. Blanks. Deputy Durrett asked Mr. Blanks if he wanted to provide a written statement, but Mr. Blanks stated that he could not see and was unable to write a statement. Deputy Durrett questioned Mr. Blanks about the incident, and testified as follows:

> I asked him, I said, "Where were you located?" He told me he was on Catfish Hut Road at the first residence past Catfish Restaurant. I said, "Okay." And I asked him what occurred. He stated that two vehicles pulled up. He said one was a -- he believed to be a jeep, the other was an unknown model pickup truck. He didn't know make, model, color or any of those -- any of those facts at the time. And I asked him what occurred. He stated that he was delivering the newspaper to Mr. James and, when he was leaving the property, there w[ere] two vehicles [that] pull[ed] up and as the vehicles pulled up, there w[ere] some subjects [that] g[o]t out . . . of the vehicle and one of 'em asked him, "What are you doing on my grandpa's property?" And he said, "Look right over there" and pointed to the porch. He said, "Your grandpa's sitting on the porch. Go ask him." And they proceeded to beat up on him and then they got in their vehicles and left.

Deputy Durrett's bodycam footage was entered into evidence, and the photographs that he took in the ambulance of Mr. Blanks's injuries were also admitted in entered. According to Deputy Durrett, Mr. Blanks's injuries appeared serious, though there were no defensive wounds on his hands indicating that he did not fight back.

The next witness was Detective Wade Wingate, who was a seven-year veteran of the Vernon Parish Sheriff's Office. Detective Wingate learned from Deputy Durrett that there had been a battery on Catfish Hut Road, that the perpetrators were

9

possibly Mr. Wallace James's grandsons, and that a dark-colored Jeep might have been involved. Detective Wingate then went to the location where some of the James family lived and observed a dark-colored Jeep parked outside. He knocked on the door, and Defendant's brother, Douglas James, answered. Detective Wingate testified that he read Douglas his *Miranda* rights, and after Douglas acknowledged that he understood his rights, he voluntarily spoke to Detective Wingate. According to the detective, Douglas told him that Defendant was also involved. Douglas then called Defendant, who lived next door, and Defendant came over to speak with Detective Wingate. Defendant was given his *Miranda* rights, he indicated that he understood his rights, and he waived his rights.

Defendant told Detective Wingate that he and Douglas were riding around when they saw a dark-colored Ford truck parked on Catfish Hut Road at the end of their grandfather's driveway. When they started walking up the driveway to check on their grandfather, a man wearing a hood, a mask, and gloves was walking towards them. Defendant said they asked the man why he was at their grandfather's house at 3:00 in the morning, but the man did not answer and instead started moving towards his vehicle. According to the detective, Defendant said he felt threatened and feared for his life in that moment. Then, Defendant and Douglas hit the man at about the same time. Defendant and Douglas's grandfather began yelling for them to stop because the man was the newspaper delivery man.

Detective Wingate also spoke to Douglas, Mr. Wallace, and the victim, Mr. Blanks. The detective learned that other people were present when the incident occurred, including Travis Moses and Charles "Max" Courville. Detective Wingate interviewed Max, who told him that Kara Edwards and Chelsea Coleman were also present. He interviewed them as well. According to Detective Wingate, Defendant

did not provide the names of these other individuals when asked, and Defendant originally stated that he rode in the vehicle with Douglas, which was later determined to be untrue.

Travis Moses was the next witness. He testified that on the night in question, he was hanging out with Defendant, who Travis described as a long-time friend. Travis then explained that he and Defendant went to Douglas's house. And when they arrived, Douglas, Max, and two females were present. Sometime between 2:00 and 3:00 a.m., the group decided to go mud riding. So Travis and Defendant got into Max's Jeep; Max was driving. Douglas, meanwhile, followed them in another Jeep with the females. As they passed Defendant's grandfather's home, they observed an unoccupied truck parked in the middle of the road. They pulled up behind the truck, got out, and looked inside the truck. Defendant and Douglas then walked up the driveway to investigate. Travis recalled that Defendant and Douglas came upon the victim who was walking towards them. According to Travis, Defendant and Douglas "confronted him," and asked what he was doing there. Travis heard the man say, "If you've got a problem with what I'm doing here, you need to ask these people." Travis denied hearing anyone suggest checking with Defendant's grandfather, Mr. Wallace, or suggest calling the police. The situation then escalated.

Travis further recalled that Defendant and Douglas tackled the man and "hit him a couple of times." At some point after the victim fell to the ground, Travis grabbed Defendant by the shoulders and pulled him out of the fight. Travis confirmed that Mr. Wallace told his grandsons to stop because the victim was delivering his newspaper. And that, according to Travis, was "the ultimate end of

11

everything." Travis believed that Douglas or Mr. Wallace helped the victim off the ground. The victim then drove off and everyone went back to Douglas's house.

Max testified next. Max explained that he, Travis, and Defendant were riding in his Jeep when they left Douglas's house around 2:30 a.m. Douglas followed in his Jeep with two females as passengers. Max noted that it was odd seeing a truck blocking the road leading to Defendant's grandfather's house. So he pulled his Jeep up next to the truck, and everyone got out. Max then removed the keys out of the truck's ignition. Max then observed a tall man wearing dark clothes, a mask, and gloves walking down the driveway, and he heard Defendant and Douglas questioning the man. According to Max, either the man did not respond, or he (Max) was too far away to hear the response.

Dr. Chanping Liang, an ophthalmology surgeon and professor of ophthalmology at LSU Shreveport, was accepted as an expert in the field of ophthalmology. She testified that when she saw Mr. Blanks, he reported having been assaulted by people the night before. She observed extensive bruises, swelling, and bleeding in both of his eyes. The left had a severe, dense subconjunctival hemorrhage indicative of a ruptured eyeball. The right eye also had bruises and a hemorrhage, but to a lesser degree. Scans showed his right eye had an orbital floor fracture which was a break in the bony area below the eyeball. The injuries to his left eye required surgery, during which the blood clots were removed, and intraocular contents came out. She attempted to suture the laceration of the eyeball, but she could not successfully suture the entire laceration due to its severity and length/location.

Ultimately, Mr. Blanks lost all sight in his left eye. And though not functional, Mr. Blanks opted to keep his left eyeball intact. By comparison, Mr. Blanks's right

eye remained intact and functional, but the bleeding in that eye continued for some time.  Dr. Liang also explained that there was a small chance that the right eye could become inflamed and develop sympathetic ophthalmia, in which case Mr. Blanks would lose sight in that eye as well.

The next witness was the victim, Woodie Blanks Jr.  He described himself as a sixty-eight-year-old veteran who delivered newspapers for the Lake Charles American Press.  One of his customers, Mr. Wallace, had cancer and requested that Mr. Blanks place his newspaper near the steps of his house.  To accommodate him, Mr. Blanks would either place the newspaper on his porch, or if Mr. Wallace was on the porch, he handed it to him.  On the day of the incident, Mr. Blanks woke up around 12:00 (midnight) and got dressed for the day.  Complying with COVID-19 guidelines, the American Press requested that its employees wear plastic gloves and a mask, which Mr. Blanks was wearing that day, along with his jeans, a shirt, and tennis shoes.

That morning, instead of driving up in Mr. Wallace's driveway, Mr. Blanks left his vehicle running on the edge of the driveway.  Mr. Blanks testified that the newspapers he would be delivering later—around 200 newspapers—were on the floorboard and the front seat of his truck.  He walked up the driveway and spoke to Mr. Wallace while giving him the newspaper.  While he was doing so, two vehicles pulled up near his truck, one on the left side, and one behind his truck.  Mr. Blanks pointed it out to Mr. Wallace, but he got no response.  Mr. Blanks then walked down the driveway to return to his truck.  As he did, he noticed two people had exited the Jeep parked on his left side and two people had exited the vehicle behind his truck. Two men came across the yard and confronted him.  Mr. Blanks testified about the ensuing altercation as follows:

13

A.     He was asking me what -- wanted to know what I was doing in their grandfather's yard.  Well, being that their grandfather was sitting on the porch, I let them know that he was right there on the porch that they could speak with him and he would explain to 'em just what I was doing there.

Q.     Yes, sir. What happened next?

A.     Well, I was attacked, uh, broadsided, knocked to the ground, and they started beating on me and the other two came and -- well, they had the better part of me and the other two they just started kicking me and -- and, uh, Mr. [Wallace] finally, uh, I heard him yell out to leave him alone and they kept beating on me. And Mr. [Wallace] made it down the driveway and pulled [th]em off of me and he helped me to my feet.

Mr. Blanks explained that he became concerned when he saw the vehicles next to his truck: he felt like he was being blocked in.  And he was trying to get to his truck when the men confronted him.  Mr. Blanks explained that he was first hit in the chest, and then he was knocked to the ground.  According to Mr. Blanks, he was "pretty much knocked out."  Mr. Blanks then explained that he "thought it was over" for him, and that all he could think to do was to try to save his face and eyes from the beating.  When asked for clarification, he said he thought he was going to die.  At some point thereafter, he heard Mr. Wallace yelling for the beating to stop, but it continued until Mr. Wallace pulled them away.

Mr. Blanks then recalled that when he tried to leave, he realized the keys to his truck were missing.  But eventually, Mr. Wallace brought his keys to him.  Mr. Blanks explained that he felt his life was in danger, and though he "really couldn't see that good" due to his eyes swelling, he knew he had to leave.  He then explained that he could not see out of his left eye at the time of trial, and that he knew there was a risk that he might lose vision in his right eye.  He told the jury that he had not worked since December 17, 2021.  And he identified Defendant as one of the people who caused his injuries.

14

On cross-examination, Mr. Blanks testified that he felt afraid when he saw the vehicles pull up, and he looked to Mr. Wallace to assist him. Defense counsel asked why he felt that way, and Mr. Blanks explained:

A.      Okay. I'm black, in a white neighborhood, a vehicle pull[ed] up beside my vehicle, one on the side, on the left side, and one behind me. I'm being blocked in so of course I was scared.

. . . .

Q.      Well, did you ask Mr. [Wallace] to go call the police department?

A.      No, sir, I didn't.

Q.      You just asked Mr. [Wallace], an 87-year-old man, to help you because you were afraid; is that right?

A.      I didn't ask him to do anything. I felt like he should have done it.

Mr. Blanks further testified that it was still dark at 3:00 a.m., and that he was not sure who had asked him why he was there. But according to Mr. Blanks, while he was telling the individuals that their grandfather was on the porch and that they could talk to him, they attacked him. Mr. Blanks was then asked why he did not tell these individuals that he was delivering newspapers. In response, Mr. Blanks explained that he thought telling them to talk to their grandfather on the porch would let them know that their grandfather was okay, and they could hear from him firsthand that he (Mr. Blanks) was his newspaper delivery man.

Mr. Blanks then suggested that the individuals could have yelled across the yard if they were concerned for their grandfather's safety. But instead, the two individuals tackled him and started hitting him. Next, according to Mr. Blanks, two other individuals "joined in with them and they started kicking" him. The people kicked him in his shoulder and legs and punched him in his stomach after he stood

15

up.  Mr. Blanks also noted that one of the individuals threatened to kill him, and he thought it was Defendant who made that threat.

Next, the State read Defendant's transcribed testimony from Douglas's trial which had occurred a few months earlier. *See State v. James*, 373 So.3d 509.  In that case, Defendant was called as a fact witness in Douglas's case-in-chief.  But in this case, by contrast, Defendant elected not to testify during his defense-in-chief.  The admissibility of this evidence is addressed in our discussion of Defendant's third assignment of error.

Nonetheless, during Douglas's trial, Defendant testified that he and his brother were approached by the victim—who was wearing a big coat, a mask, and gloves—about halfway up the driveway as they were going to check on their grandfather.  He and the victim stopped a few feet from each other.  The brothers then asked the victim what he was doing at their grandfather's house two or three times, but the victim did not respond.  And when asked if the victim responded at some point, Defendant stated:

> I remember the last -- last time asking what he was doing at my grandpa's house, I remember a -- a remark was he said, "If this is your grandpa's, you can ask him."  And he stepped towards us.

Defendant recalled being scared.  He was concerned about his grandfather.  According to Defendant, Douglas hit the victim; Defendant went to the ground with the victim; the victim briefly fought back; and the fight was over in a few seconds.  When Defendant got up, his grandfather was there, and they walked the victim to his truck.

Defendant clarified that he and his brother rode in separate vehicles that night, and Defendant said that he did not look in the victim's truck when they got there.  Defendant also clarified that his grandfather pulled him off the victim.  Defendant

confirmed that the victim did not swing or lunge at them. Yet Defendant noted that he felt as though the victim was "gonna go through [him], if [he] didn't get out of the way." Defendant then testified that nothing would have happened if the victim had said he was delivering newspapers.

On appeal, Defendant asserts that he acted in self-defense: he felt threatened and reasonably acted out of fear for his life and the lives of others. His actions were necessary to prevent Mr. Blanks from committing a battery upon himself or others. This is Defendant's argument.

Louisiana Revised Statutes 14:18 sets forth the defense of justification, stating in relevant part:

> The fact that an offender's conduct is justifiable, although otherwise criminal, shall constitute a defense to prosecution for any crime based on that conduct. This defense of justification can be claimed under the following circumstances:
>
> . . . .
>
> (7) When the offender's conduct is in defense of persons or of property under any of the circumstances described in Articles 19 through 22.

Louisiana Revised Statutes 14:19 provides, in pertinent part:

> A. (1) The use of force or violence upon the person of another is justifiable under either of the following circumstances:
>
> (a) When committed for the purpose of preventing a forcible offense against the person or a forcible offense or trespass against property in a person's lawful possession, provided that the force or violence used must be reasonable and apparently necessary to prevent such offense.
>
> . . . .
>
> C. A person who is not engaged in unlawful activity and who is in a place where he or she has a right to be shall have no duty to retreat before using force or violence as provided for in this Section and may stand his or her ground and meet force with force.

This defense was addressed in *State v. Hall*, 606 So.2d 972 (La.App. 3 Cir. 1992), *writ denied*, 93-51 (La. 11/11/94), 644 So.2d 385. There, this court explained:

> In non-homicide cases, . . . the defendant [has] the burden of proving self-defense by a preponderance of the evidence. The issue of self-defense requires a dual inquiry: (1) an objective inquiry into whether the force used was reasonable . . . ; [and] (2) a subjective inquiry into whether the force was apparently necessary[.]

*Id*. at 973–74 (citations omitted).

Here, the evidence shows that Defendant and Douglas intentionally confronted Mr. Blanks in their grandfather's driveway, that Mr. Blanks—who was then sixty-six years old—approached Defendant and Douglas as he was walking down the driveway, that Mr. Blanks took no aggressive action towards Defendant and Douglas, and that Mr. Blanks was simply walking to his vehicle. The evidence also shows that Mr. Blanks was wearing a mask and plastic gloves in compliance with his employer's COVID-19 guidelines.

In the end, even though Defendant contends it was reasonable for him to be suspicious under the circumstances, his actions were objectively unreasonable. Rather than attacking the victim, Defendant could have walked around the victim to check on his grandfather or called the police. It is clear from the record that Defendant's actions were neither reasonable nor necessary. Thus, the jury rationally determined that the force used by Defendant was neither reasonable nor apparently necessary to prevent Mr. Blanks from committing an offense against Defendant or others.

Defendant next argues that the State failed to prove beyond a reasonable doubt that the serious bodily injuries inflicted on the victim were "the direct result of

[Defendant's] actions—as opposed to those of Doug James, Max Courville, or Travis Moses." As stated previously, the State was required to prove the following elements to sustain a second degree battery conviction: (1) the intentional use of force or violence upon the person of another, (2) without the consent of the victim, (3) when the offender has the specific intent to inflict serious bodily injury. *State v. Fuller*, 414 So.2d 306 (La.1982).

Defendant here concedes that he tackled and hit the victim. Yet his testimony on this point is somewhat unclear. In the example that follows, for example, Defendant admits hitting Mr. Blanks:

> Q. Let's start right there with what you just said. You admit that you hit Mr. Blanks, correct?
>
> A. I -- I'm -- when we went to the ground, I'm -- yes, sir, I guess.
>
> Q. You hit him, correct?
>
> A. Yes, sir.

But later in his testimony, Defendant explains that he only tackled Mr. Blanks to the ground. Defendant's testimony then changes again, and he admits to hitting Mr. Blanks:

> Q. You punched him, correct?
>
> A. Correct.
>
> Q. You would agree with me that that's violence and force upon him, correct?
>
> A. I mean --
>
> Q. Sir?
>
> A. I guess, yes, sir.
>
> Q. And you would agree with me that those injuries that he sustained are serious?

A. Correct.

In addition, Mr. Blanks testified that he was hit in the chest area, then two guys got on top of him and were beating him, and two other guys started kicking him. Mr. Blanks noted that after he was knocked to the ground and the beating began, he thought his life was over. All he could think to do was to try to save his face and eyes from the beating. According to Mr. Blanks, all the punches hit him in the face. And Mr. Blanks identified Defendant as one of the individuals who caused his injuries.

In *State v. Diaz*, 612 So.2d 1019 (La.App. 2 Cir. 1993), the second circuit rejected the defendant's sufficiency-of-the-evidence challenge and affirmed the conviction for second degree battery. In doing so, the appellate court explained:

> Defendant makes much of the fact that he only struck the victim once, failed to knock the victim to the floor or render him unconscious, and did not pursue the victim after striking him. These factors, argues defendant, indicate an absence of intent to cause serious bodily harm. We do not agree. The supreme court has firmly rejected the notion that the second degree battery statute envisions an offender who mercilessly beats a fallen victim. The statute clearly states that the intended harm is "serious bodily injury" and defines this to involve, among other things, unconsciousness, extreme physical pain or protracted and obvious disfigurement. Under the circumstances of this case, when Diaz struck Bullock as hard as he could, he intended to cause serious bodily injury as contemplated by the statute.

> Indeed, as a consequence of defendant's blow, Bullock's jaw was broken in two places. He testified that his mouth was bleeding after the blow and his jaw "just kinda jingled." He further stated that some of his teeth appeared to be missing but that he later learned the gap in his lower row of teeth was caused by the separation of the fractured pieces of his mandible. Dr. Willis confirmed that the fractures created a six millimeter gap between Bullock's teeth, and he described the breaks in Bullock's jaw as a "serious injury." Bullock described his pain as "excruciating," and his mother testified that he was asking for a pain shot at the hospital. The injury required a five-hour reparative surgery during which Bullock was under general anesthesia. For approximately two months following surgery, Bullock's mouth was wired shut, which kept him from eating solid foods and greatly impaired his ability to speak. According to his mother, at the time of trial, some eight months

20

after the fight took place, Bullock's face was still disfigured, and he was still having reparative work done to his teeth.

> We find that, viewing the evidence as a whole in a light most favorable to the prosecution, any rational trier of fact could have found proof beyond a reasonable doubt that Diaz struck Bullock without the latter's consent and with the specific intent to cause serious bodily injury.

*Id*. at 1022–23 (citations omitted).

More recently, the second circuit disposed of the same argument in *State v. Linnear*, 44,830 (La.App. 2 Cir. 12/9/09), 26 So.3d 303. In that case, the appellate court noted the following:

> In addition to arguing he lacked the requisite specific intent to cause great bodily injury, Linnear asserts that there was insufficient evidence to show that Linnear caused Fuggins' injuries. He asserts that only circumstantial evidence links Fuggins' injuries to Linnear and that this circumstantial evidence does not exclude every reasonable hypothesis of innocence. In the defendant's own statement, he admitted that he reacted to the victim's antics by knocking him to the ground and continuing to punch him. Linnear's statement was corroborated by Crutchfield who testified that "when he [Fuggins] fell, Stacey got on him; hit him two more times." Although the defense offered alternative hypotheses, suggesting that Fuggins' injuries may have been caused by other patrons dancing or by security personnel when they carried him out of the club, the jury chose to discredit these explanations. Rather, the jury found that the strength of circumstantial evidence provided a direct link between Linnear's admitted acts and Fuggins' injuries and excluded all hypotheses set forth by the defense.

*Id*. at 307–08 (alteration in original).

In the case before us, Defendant and his brother confronted Mr. Blanks in the driveway asking what he was doing at their grandfather's house. They heard him say something to the effect that if they wanted to know what he was doing there, they could ask their grandfather. Mr. Blanks was not acting aggressively. Yet Defendant and his brother struck the elderly victim with such force that serious injury resulted. Again, Mr. Blanks was sixty-six years old at the time of this attack.

21

And the injuries that he sustained included extensive bruising and bleeding in both eyes, with the damage to the left eye so severe that he lost all vision in that eye.

In the end, the evidence adduced at trial, when viewed in a light most favorable to the prosecution, is sufficient to prove all elements of second degree battery beyond a reasonable doubt. Defendant's first assignment is therefore without merit.

## III.  Defendant's Second Assignment of Error

In his second assignment of error, Defendant contends that the facts of this case do not warrant a maximum sentence of incarceration with only one year suspended. However, because Defendant did not file a motion for reconsideration and because Defendant did not object to his sentence with specific reasons at the sentencing hearing, we will review this assignment as a bare claim of excessiveness. *See, e.g., State v. Debarge*, 17-670 (La.App. 3 Cir. 2/7/18), 238 So.3d 491.

This type of review—a bare excessiveness review—was addressed in *State v. Barling*, 00-1241 (La.App. 3 Cir. 1/31/01), 779 So.2d 1035, *writ denied*, 01-838 (La. 2/1/02), 808 So.2d 331. There, this court explained as follows:

> La. Const. art. I, § 20 guarantees that, "[n]o law shall subject any person to cruel or unusual punishment." To constitute an excessive sentence, the reviewing court must find the penalty so grossly disproportionate to the severity of the crime as to shock our sense of justice or that the sentence makes no measurable contribution to acceptable penal goals and is, therefore, nothing more than a needless imposition of pain and suffering. *State v. Campbell*, 404 So.2d 1205 (La.1981). The trial court has wide discretion in the imposition of sentence within the statutory limits and such sentence shall not be set aside as excessive absent a manifest abuse of discretion. *State v. Etienne*, 99–192 (La.App. 3 Cir. 10/13/99); 746 So.2d 124, *writ denied*, 00–0165 (La.6/30/00); 765 So.2d 1067. The relevant question is whether the trial court abused its broad sentencing discretion, not whether another sentence might have been more appropriate. *State v. Cook*, 95–2784 (La.5/31/96); 674 So.2d 957, *cert. denied*, 519 U.S. 1043, 117 S.Ct. 615, 136 L.Ed.2d 539 (1996).

*Id.* at 1042–43 (alteration in original).

Additionally, there a handful of factors that an appellate court may consider in determining whether a sentence is shocking or makes no meaningful contribution to acceptable penal goals, including (1) the nature of the offense, (2) the circumstances of the offender, and (3) a comparison of the sentences imposed for similar crimes. *State v. Smith*, 99-606 (La. 7/6/00), 766 So.2d 501.

Looking first to the nature of the offense, we have already thoroughly discussed the offense and will not restate those details. However, the offense of second degree battery is enumerated as a crime of violence. La.R.S. 14:2(B). And a sentence for second degree battery carries a fine of not more than two thousand dollars and imprisonment for not more than eight years with or without hard labor. La.R.S. 14:34.1(C). Again, Defendant here was sentenced to eight years at hard labor with one year suspended and three years of supervised probation. In addition, a fine of $2,000.00 and court costs were imposed, and Defendant was ordered to pay a monthly supervision fee of $60.00 and $11.50 to the sex offender technology fund.

Turning now to Defendant's nature and background. At the sentencing hearing, Defendant was described as a twenty-six-year-old first felony offender. He was single and a father of two. The trial court noted Defendant's good employment history but observed that he had been arrested several times and had several pending charges. Defense counsel called no witnesses and presented no arguments in mitigation. Before imposing the sentence, the trial court discussed the following mitigating and aggravating factors:

> The Court did, in fact go through the Sentencing Guidelines of Article 894.1 and I'll talk about that a little later. Was economic harm caused to the victim? The answer is, "Yes." And I will discuss some of the other things shortly.

This defendant is 26 years of age. He is not married. He has two children. The defendant is in good health. He is a pipefitter. He graduated from high school. He states he does not have a history of drug or alcohol abuse. However -- and this is according to the presentence investigation -- however, the Court notes that on January the 25th of 2015 he was arrested for underage drinking, uh, underage driving under the influence. On 4/15 of '18, he was arrested for OWI and on 4/15 of '22 he was arrested for DWI second in Billings, Montana.

This case was tried before the jury on October the 1[7]th of 2022. The jury found him guilty, and we are here today for sentencing. I received letters from Mr. Blanks, in the prior case, and his daughters which I have reviewed. As to the defendant's criminal history, this is his first felony. The Court looked specifically at Code of Criminal Procedure Article 894.1, the Sentencing Guidelines, for the aggravating and mitigating factors. As far as aggravating factors, the Court finds that the offender used threats of or actual violence in the commission of the offense. The offense resulted in a significant permanent injury and economic loss to the victim and his family. A lesser sentence would deprecate the seriousness of the offense. As far as the mitigating factors, the Court finds that the defendant has no history of prior delinquency or criminal activity or has led a law-abiding life for a substantial period of time before the commission of the instant offense, except for the charges stated earlier and the Court also notes that he has an outstanding criminal damage to property and a domestic abuse battery charge pending.

The facts reflect that Mr. James and his brother attacked Mr. Blanks around 3:00 AM on the morning of December the 17th of 2021. The Court's concerns are the injuries to Mr. Blanks. The testimony of Dr. Liang, at trial shows that, as a result of the attack, Mr. Blanks had extensive bruising, bruises and bleeding in both eyes. The left eye had a severe[,] dense subconjunctival hemorrhage. In other words, the white part of the eyeball was filled with dense blood. The eyeball was ruptured. His right -- right eye had an orbital floor fracture. He was then operated on and they found a laceration behind the eye and they had to remove a blood clot and he lost a lot of the fluids inside the eyeball which resulted in significant pain. As a result of this incident, Mr. Blanks lost sight in his left eye. There is also a risk of losing sight in the right eye. These injuries did, in fact cause severe pain during the time and Mr. Blanks is still experiencing severe pain. The victim stated to the Court, in his letter, that since the loss of his vision in his eye, uh, he cannot shave, he cannot groom himself, he cannot cook or bathe himself. He will forever need assistance. He has daily pain in his eyes and, on most days, it is unbearable. He has also, neurological issues he didn't have before. He often has nightmares. He also lost and will forever lose the quality of enjoyment with his daughters and grandchildren in the future. He also lost the ability for income that he

had prior to this incident. The Court will note that there was [sic] not any bills provided to this Court or any request for restitution. The Court assumes that it is because of the testimony at trial regarding a possible civil suit. The testimony at trial, from the defendant and his brother, was that they did not intend to cause these results. Whether that is true or not has little, if any, to do with the outcome. Once you start down the road using violence, there is always a possibility of unintended results. The fact is Mr. Blanks' life was forever changed on that fateful night caused by the action of this defendant and his brother.

The last factor to consider is the imposition of sentences for similar crimes. Defendant's brother, Douglas, was tried separately and convicted of second degree battery. He was sentenced to eight years at hard labor with one year suspended and three years of supervised probation. His conviction and sentence were affirmed on appeal. *See State v. James*, 373 So.3d 509.

Similarly, in *State v. Linnear*, 44,830 (La.App. 2 Cir. 12/9/09), 26 So. 3d 303, the second circuit affirmed a near maximum sentence of four years and nine months on a defendant who became angry, lost control, knocked the victim unconscious, and left the scene with the victim unattended.[2] Linnear's statement indicated that the victim was "throwing" gang signs in his face and bumping into him at a nightclub, and Linnear eventually "went off" and punched him, knocking him to the cement floor. The victim did not have the opportunity to fight back, and Linnear got on top of him and repeatedly hit him. The victim's injuries, which consisted of multiple jaw fractures, a head injury, and an ensuing decubitus ulcer on his back, required weeks of intensive care and ongoing lengthy, costly rehabilitation. Linnear's criminal history consisted of misdemeanor convictions for disturbing the peace by fighting and domestic abuse battery, with prior terms of probation being revoked for

---

[2] This opinion was rendered in 2009. At that time, the maximum term of imprisonment for second degree battery was five years at hard labor. The maximum sentence was increased to eight years by 2014 La. Acts No. 722, § 1.

25

noncompliance. He argued on appeal that the term of incarceration would place an undue hardship on his family as they relied on him both financially and in helping with the care of his disabled child who suffered from cerebral palsy. He noted that he participated in rehabilitative programs while incarcerated, including anger management.

In short, the trial court here did not abuse its discretion in imposing the near maximum sentence. The record supports the trial court's reasoning that a lesser sentence would diminish the seriousness of the offense, especially considering the degree of injuries inflicted. Defendant's sentence is not constitutionally excessive. And Defendant's second assignment is without merit.

## IV.   Defendant's Third Assignment of Error

In his third assignment of error, Defendant asserts his Fifth Amendment privilege against self-incrimination and right to remain silent was violated when the trial court allowed his previous testimony from Douglas's trial to be read to the jury.

The privilege against self-incrimination was addressed in *State v. Lagarde*, 05-268 (La.App. 5 Cir. 11/29/05), 917 So.2d 623. In that case, the fifth circuit stated as follows:

> Both the United States Constitution and the Louisiana Constitution provide a privilege against self-incrimination. The privilege against self-incrimination can be claimed in any type of proceeding, whether it is civil, criminal, administrative, judicial, investigatory or adjudicatory. Further, the privilege protects any disclosures that the witness may reasonably apprehend could be used in a criminal prosecution or that could lead to other evidence that might be so used. The privilege against self-incrimination must be liberally construed in favor of the accused or witness.
>
> However, the Fifth Amendment does not automatically preclude self-incrimination, whether spontaneous or in response to questions put by government officials. In the absence of officially coerced self-incrimination, the Fifth Amendment privilege is not violated by even

26

the most damning admissions. As explained by the Supreme Court, a witness can lose the privilege by failing to assert it:

> . . . a witness confronted with questions that the government should reasonably expect to elicit incriminating evidence ordinarily must assert the privilege rather than answer if he desires not to incriminate himself . . . *But if he chooses to answer, his choice is considered to be voluntary since he was free to claim the privilege and would suffer no penalty as the result of his decision to do so.*

*Id.* at 627–28 (footnotes omitted).

In our case, the State filed a pre-trial notice of intent to use "[s]tatements made by the defendant, Dillon James[,] while testifying in the trial of Douglas Paul James on August 31, 2022." In response, Defendant moved to exclude this evidence. At the hearing on this motion, defense counsel argued that

> [Dillon James] was a witness in that case. This is a different jury. It's a different, uh, defendant. It's a different attorney. It's a different trial altogether. He was a witness. Now, he can't be called by the State as a witness in this case. So how can his testimony be introduced because he gave testimony at another trial which really had nothing to do with this one although they were co-defendants. So my point is this, Your Honor, if -- if that is allowed, then that would cause -- cause the defendant in this case to have to give a second thought about whether he wanted to get on the stand in this case and everyone knows he doesn't have to.

In contrast, the State argued that because Defendant was advised of his right to remain silent prior to his testimony and because Defendant waived that right by voluntarily testifying, any incriminating statements that he made were admissible as statements against his interest. The trial court agreed, explaining:

> I specifically want to say that, in that case, of course, [counsel for Dillon James] was in fact present. I know that [counsel] had discussions with his client regarding the severity of if he chose to testify and, of course, the --- the Court also, out of the presence of the jury, advised him against his, uh, right against self-incrimination and that he could not be forced to testify; however, if he chose, uh, to do so and waived that right, then, of course, that testimony could be used against him in his trial and he certainly knew that and understood and chose to go ahead

27

and testify. So, based on all that, the Court is going to deny the motion to exclude the evidence.

On appeal, Defendant acknowledges that he was advised of his right to remain silent by his counsel and the trial court, and Defendant acknowledges that he waived that right and made admissions during his testimony. He nonetheless argues that because he was not a defendant in his brother's trial, the State could not offer his prior statements against him during his trial: We disagree.

In *State v. Redwine*, 311 So.2d 855 (La.1975), the supreme court held that there was no error in the admission of Redwine's self-inculpatory testimony given at a prior trial where he testified as a defense witness for his friends who were charged with possession of opium. After the friends were convicted, the State filed charges against Redwine, with the principal evidence used to convict him being the testimony he had given in the prior trial. The supreme court found no error and affirmed Redwine's conviction. And in doing so, the court explained:

> The defendant Redwine was convicted of possessing opium with intent to distribute it, La.R.S. 40:967A, and sentenced to twenty years at hard labor. Upon his appeal, he principally questions the admission into evidence at the present trial of his own testimony given under oath at a prior trial of two of his friends for the possession of the same opium.

> The prior trial resulted in the convictions of the two friends, a husband and wife, which we affirmed in *State v. Devall*, 296 So.2d 802 (La.1974). Redwine, the present defendant, voluntarily appeared as a defense witness and freely testified that he himself had hidden the opium in the Devall apartment, entirely unbeknownst to the Devalls.

> Before the State introduced Redwine's prior-trial testimony into evidence in the present case, it produced evidence that it was freely and voluntarily given and not compelled or the result of coercion. An attorney had been appointed by the trial judge at the Devall trial to confer with Redwine before he took the stand, and this attorney testified in this case that he had informed Redwine of his constitutional rights not to testify and against self-incrimination and that, in fact, he had advised Redwine not to testify because of the self-incrimination aspects. The attorney also testified as to the apparent voluntariness and lack of promises or coercion.

28

No error is shown in the admission of the prior-trial testimony. If a predicate is required for its admissibility as a confession or deposition testimony in the subsequent (or present) trial, see La.R.S. 15:451 (1950), the State has adequately proved: that the defendant freely and voluntarily took the stand and testified to help his friends; that (in view of the strong advice of counsel not to testify) such testimony was not compelled; and that it was not made under the influence of coercion or inducements.

*Id.* at 856 (citations omitted).

Like the defendant in *State v. Redwine*, Defendant here was advised during his brother's trial that he had the right not to say anything that would incriminate him, yet he knowingly and voluntarily waived this right and thereafter made incriminating disclosures. Thus, no error is shown in the admission of Defendant's prior trial testimony, meaning that this assignment is also without merit.

## DISPOSITION

Both Defendant's conviction and sentence are affirmed. This matter is remanded to the trial court for the establishment of a payment plan for the fine and court costs imposed as conditions of probation in compliance with La.Code Crim.P. art. 875.1; and the trial court is also ordered to correct the sentencing minutes to accurately reflect the imposition of the fine and court costs as conditions of Defendant's probation and to accurately reflect that Defendant must pay $11.50 per month to the Sex Offender Registry Technology Fund.

**AFFIRMED AND REMANDED**
**WITH INSTRUCTIONS.**